**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| Niki White, as Independent Administrator of the Estate of Tanicialle Brown, <br><br> Plaintiff, <br><br> v. <br><br> Douglas Powell, T1 Transport, Inc., and FedEx Ground Package Systems, Inc., d/b/a FedEx Ground, <br><br> Defendants. | Case No. 3:21-cv-50094 <br><br> Honorable Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

In the early morning hours of January 11, 2020, Tanicialle Brown was tragically killed in a vehicle collision with a tractor trailer on I-90 in Rockford, Illinois. The lone surviving eyewitness to the collision was the driver of the tractor trailer, defendant Douglas Powell.[1] In the aftermath of the collision, records establish that video recording software should have been present in the truck. But no footage has ever been produced, and Defendants claim it never existed. Niki White, acting as administrator of the Brown estate, sought leave to file a Fourth Amended Complaint to add counts of negligent supervision against T1 Transport and FedEx related to the footage, which was denied for lack of good cause and being untimely in November 2023. White now seeks Rule 37(e) relief regarding the supposed destruction of the

---

[1] Miraculously, a toddler in a car seat also survived the crash; however, any details she remembers about the crash are unknown to the Court at this time. A motion *in limine* barring reference to the child at trial was previously granted.

video. Because a preponderance of the evidence doesn't support a finding that the video ever existed, the motion [265] is denied.

**Relevant Background[2]**

The truck driven by Powell—a 2014 International Prostar—was owned and operated by Defendant T1 Transport, which held a contract with Defendant FedEx Ground ("FedEx"). Motion ex. 1. Hardware under the brand name Lytx—used in T1 Transport trucks pursuant to its contract with FedEx—records force upon any impacts, as well as hard turning, hard braking, hard accelerations, lane deviations, and front and rear audio-video from the cab of the truck. Jensen dep. at 123:14-124:1. But even with that modern technology, footage is apparently not automatically uploaded remotely to a cloud-based server. Jensen dep. at 121:12-121:19; Martensen dep. at 89:13-89:24. Upload instead requires physical possession of the camera. *Id.*

Documentation related to FedEx's approval of the truck for service—including a safety technology tractor file checklist dated November 10, 2019, a service provider tractor information sheet dated in late 2019, and email correspondence between T1 Transport and FedEx dated December 17, 2019—reflects extensive information regarding the apparent nature of the truck's safety features.[3] As it relates to video-recording technology, this includes:

---

[2] The facts surrounding the motion are generally uncontested, with the significant exception of the elephant in the room: did dashcam video exist and if so, what happened to it?

[3] The safety technology tractor file checklist is signed by T1 Transport, but not by a representative of FedEx. However, an internal email within FedEx dated November 11, 2019, reflects that approval of the vehicle contract was expressly conditioned on the receipt of several documents, including the safety technology tractor file checklist. On the other hand, the service provider tractor information sheet is signed by both T1 Transport and FedEx.

- On the safety technology tractor file checklist, the truck was reportedly equipped with a DriveCam (Lytx) video event data recorder ("VEDR"), which met functionality specifications. Proof of connectivity was reportedly provided by T1 Transport.[4]

- On the service provider tractor information sheet, a signature from a representative of FedEx "attest[s] to reviewing the vehicle attributes and confirm[ing] that it meets the contractual requirements."

- In email correspondence from T1 Transport to FedEx providing information on the truck, the line "VEDR is Lytx" is present.

During the discovery phase in this case, more proverbial "smoke" was uncovered pointing toward a "fire" in the likelihood that a dashcam should have been present on Powell's truck. Depositions with Kelly Martenson, a FedEx Linehaul Manager responsible for overseeing immediate information intake following a collision; Gayle Bergstrom, a FedEx Senior Manager responsible for contracting with trucking operators such as T1 Transport; Corey Jensen, a T1 Transport General Manager who self-described himself as doing "literally everything" at T1 Transport; Mike Schroeder, a T1 Transport Operations Manager; and Travis St. Ores, the owner of T1 Transport, revealed the following:

- Martenson memorialized a call between her and Schroeder at approximately 4:00am the morning of the collision, remarking in her notes: "VEDR – yes," "FCAM – yes," with an arrow pointing from these statements to another: "Don't forward until further notice."[5] Martenson dep. at 67:5-67:13; 93:10-94:11; Motion ex. 5. Martenson was told not to forward the video by "someone" at FedEx. *Id.* at 90:15-91:2.

---

[4] The safety technology tractor checklist also confirms that the truck should have been equipped with Forward Collision Warning/Lane Departure Warning ("FCW/LDW") and Forward Collision Avoidance and Mitigation ("FCAM") systems. Only the video-recording technology ("VEDR") is at issue in this motion.

[5] These notes were also not provided to White in discovery until approximately 15 minutes before Martenson's deposition. Martenson dep. at 13:3-13:10. The Court is disappointed in this tardy production. The Court expects better from counsel and parties.

3

- Bergstrom confirmed that "to get a tractor file approved, we [at FedEx] require an inspection of that tractor." Bergstrom dep. at 58:19-59:1.

- Bergstrom confirmed that T1 Transport was required to have VEDRs installed in its trucks as of August 19, 2019. Bergstrom dep. at 166:8-166:12; 167:5-167:9. This included a requirement that Powell's truck—at least by the time of the collision—be equipped with forward and rear-facing cameras. *Id.* at 170:24-171:5.

- Bergstrom confirmed that a request for video footage of the collision was sent to T1 Transport by FedEx, under the belief that the video existed. Bergstrom dep. at 132:7-133:7.

- Bergstrom was surprised when she learned there wasn't video footage available from the collision. Bergstrom dep. at 171:20-172:1.

- Jensen testified to installing VEDR cameras for T1 Transport and that he and St. Ores reviewed videos and contacted drivers as a part of safety reviews. Jensen dep. at 26:10-26:23; 33:13-33:20; 125:13-125:20; *see also id.* at 29:2-29:5; 29:12-29:20.

- Jensen reported that he believed—before the collision and during the preliminary investigation surrounding the collision—that Powell's truck had a VEDR system installed. Jensen dep. at 120:23-120:25.

- Jensen reported it was a "large surprise" to him when Powell stated that there was no camera in the truck. Jensen dep. at 121:25-122:3.

- Jensen reported that St. Ores purchased cameras for the entire fleet of vehicles, including for Powell's truck. Jensen dep. at 128:16-130:6.

- St. Ores confirmed he bought some dashcam cameras in the 15 months he owned T1 Transport ("more than one, less than thirty probably."). St. Ores dep. at 147:23-150:18. But he couldn't recall or claimed to have no knowledge where any orders, receipts, or invoices for these camera purchases would be located. *Id.*

- Jensen was unambiguous. "Every truck – every truck's supposed to have a camera. It's – it's always been that way. It's a company – everything. It's the way the company ran." Jensen dep. at 139:8-139:11. But St. Ores reported that "more times than not rental tractors… did not have cameras installed in them." St. Ores dep. at 154:7-154:8.

- St. Ores couldn't recall how many of the trucks in his fleet were equipped with video cameras. St. Ores dep. at 135:11-135:20.

- St. Ores acknowledged that FedEx required cameras to be on board T1 Transport's trucks. St. Ores dep. at 151:18-152:1. But he didn't know how many of T1 Transport's trucks weren't in compliance with those FedEx requirements. *Id.* at 138:10-138:13.

- St. Ores' version of company procedures related to VEDR installation is largely inconsistent with Jensen's. Jensen claimed that he installed every camera on the lot after receiving training from Lytx before T1 Transport's purchase of the company, and that Powell's truck should have had a video camera. Jensen dep. at 125:5-125:20; 139:17-139:23. But St. Ores reported that Lytx themselves—not anyone at T1 Transport—was supposed to install cameras for T1 Transport, and that Lytx rescheduled the appointment to install a camera on Powell's truck, which led to no camera being present on Powell's truck.[6] St. Ores dep. at 131:20-132:4.

- Both St. Ores' and Martenson's version of events related to any VEDR system being in Powell's truck specifically are also inconsistent with Jensen's version of events. Jensen claims that in the first or second conversation with Powell immediately after the accident, he requested Powell "force upload" the VEDR footage, at which time he and Mike Schroeder—also on the call—were informed that there was no camera. Jensen dep. at 75:1-75:9; 121:5-121:19. But St. Ores reported that he asked Schroeder for video footage when they first spoke at 1:40am and was told they were working on retrieving it. St. Ores dep. at 132:20-133:1. And Martenson reported that her conversation with Schroeder—during which she marked "VEDR – yes" and "FCAM – yes"—occurred at approximately 4:00am, two-and-a-half hours after these first conversations.[7] Martenson dep. at 93:10-94:11.

Meanwhile, as Defendants are concerned, their assertion is that a camera—despite the above signs pointing to the contrary—was never actually installed on Powell's truck. Jensen dep. at 130:4-130:10; St. Ores dep. at 132:3-132:4. Bergstrom,

---

[6] St. Ores reported that these rescheduled appointments with Lytx were done via email, But, curiously, the email domain expired and he has no method of recovering these emails. St. Ores dep. at 171:18-172:18.

[7] It's perplexing why Powell would even still be at the crash site at 4:00am, given that he was subjected to a police investigation and standard Department of Transportation drug and alcohol screening procedures following the collision.

Powell, Schroeder, Jensen, Martenson, and St. Ores all denied either that there was a camera on board or having ever viewed any video footage of the collision. Bergstrom dep. at 126:14-126:18; Jensen dep. at 164:17-165:2; Martenson dep. at 22:8-22:10; St. Ores dep. at 130:24-131:21; Powell dep. at 88:13-88:16; Schroeder dep. at 82:8-82:12.

Jensen reported that on the seldom occasion a truck camera were to lose connectivity, he would receive an email informing him.[8] Jensen dep. at 126:17-127:2. Schroeder meanwhile provided several reasons for why he believed there was no camera on board with Powell. First, he argued that if there had been video, Lytx would have been in possession of it to send to "whoever else needed it."[9] Schroeder dep. at 82:8-82:20. Second, he stated that the camera would still be in the truck. *Id.* at 82:21-82:22. Third, he asserted that it was "not possible" for Powell to have removed the camera himself, because the cameras were hardwired into the truck, included 30-40 feet of wiring, were secured to the windshield with industrial strength glue, would take hours for Powell to remove, and that faster removal would cause damage to the truck and windshield.[10] *Id.* at 115:22-116:21.

---

[8] Jensen wasn't asked and didn't offer information on whether a connectivity email was ever received for a Ltyx camera in Powell's truck. He also didn't provide information about what he meant by "connectivity" and whether it related to software or hardware connection. He stated several times that there was no camera in Powell's truck at the time of the collision; however, he did state that he "wouldn't know" if one was present on November 10, 2019, when the safety information checklist was completed. Jensen dep. at 148:14-148:19. For his part, St. Ores reported that to his knowledge, a camera was never installed on Powell's truck. St. Ores dep. at 152:2-152:5.

[9] This point seems to contradict assertions by Jensen, Powell, and Martensen regarding how video is retrieved and stored. The record doesn't indicate that Lytx automatically receives these videos; rather, the record reflects that they must be uploaded by someone in physical possession of the camera first, and at that point Lytx servers—and T1 Transport administration—would have access to the video footage. Schroeder apparently confirms this himself by stating that had Powell attempted to remove the camera, he would have "jostled" the camera enough to send a video. Schroeder dep. at 116:23-117:4.

[10] Schroeder acknowledged that he hadn't seen pictures of the truck following the collision and the significant damage done by the collision, which totaled the truck. Schroeder dep. at 117:5-117:13.

One throughline argument made by several individual representatives of Defendants is T1 Transport's assertion that Powell's truck was not yet a "permanent" truck—but still a "rental" truck—and that by nature of the contract with FedEx, only "permanent" trucks were required to have safety features detailed above, including VEDR cameras installed. Jensen dep. at 138:22-139:2.

Practically, there is little distinction between "rental" and "permanent" trucks as used by T1 Transport and FedEx. Jensen reported that T1 Transport perceived a contractual distinction in that T1 Transport "rental" trucks weren't "contracted vehicle[s]" and therefore weren't subject to the same requirements set by FedEx. *Id.* at 138:14-138:21. He further explained that trucks owned by T1 Transport but not yet assigned a permanent number by FedEx were "rented" by T1 Transport to themselves, to allow T1 Transport to continue to be on the road for FedEx. *Id.* at 114:1-114:8. According to Jensen, "rental" trucks were only required to have a cab card and insurance. *Id.* at 114:15-114:16. Bergstrom, on the part of FedEx, agreed that there was a distinction. Bergstrom dep. at 168:17-169:16.

But Jensen also admitted that the number assigned to Powell's truck *was* the permanent FedEx number; that all documentation to assign Powell's truck permanent status had been submitted to FedEx before the collision; that FedEx had "informally" approved the truck to enter permanent status; and that the chain of command at FedEx indeed approved the truck's permanent status shortly *after* the collision: the paperwork approval chain had already been set in motion and wasn't stopped upon the truck being totaled in the collision. Jensen dep. at 109:23-110:10;

110:21-111:21; 113:20-113:25. St. Ores provided the same argument—insisting that "rental" trucks were distinguishable from "contract" trucks. St. Ores dep. at 167:4-170:8. But he was unable to identify where in the contract this distinction was made. *Id.* Likewise, Bergstrom also couldn't identify a specific contractual provision supporting this distinction. Bergstrom dep. at 169:6-169:9. And, in any event, "[r]egardless of it's a rental, spare, if we're borrowing a truck, it was our – we were supposed to have a camera in it, according to T1." Jensen dep. at 139:13-139:16.

Finally, the S-E-A investigation and accident reconstruction found no evidence that a dashcam had been in the vehicle. *See* dkt. 171-7, S-E-A Accident Reconstruction Report at p. 26. Law enforcement and reconstruction investigation pictures of the windshield—reproduced inline below—show no visible damage to the windshield nor any sign of a dashcam ever having been secured. *Id.*



Figure 25: Law enforcement photograph compared to S-E-A photograph of ProStar interior.



Figure 26: Interior of ProStar during inspection.

**Legal Standard**

Once a party reasonably anticipates litigation, it is duty-bound to take good faith steps to preserve documents and data that may be relevant to the litigation. *DR Distribs., LLC v. 21st Century Smoking, Inc.*, 513 F.Supp.3d 839, 929 (N.D. Ill. 2021). A motion under Rule 37(e) relates to the "failure to preserve electronically stored information." *Id.* at 958; Fed. R. Civ. P. 37(e). In addressing such a motion, five threshold requirements must be met: (1) the information must be ESI; (2) there must have been anticipated or actual litigation that triggers the duty to preserve ESI; (3) the relevant ESI should have been preserved at the time the litigation was anticipated or ongoing; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI cannot be restored or replaced through additional discovery. *Id.* Only if all five of these requirements are met are curative measures available under the Rule. *Id.*

But this analysis assumes a prerequisite—that the ESI at question existed in the first place. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 292 (3d Cir. 2018) (lack of evidence that dashcam existed not enough to provide curative instruction regarding alleged spoliation). "For spoliation 'sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence actually existed and was destroyed.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, 341 F.R.D. 474, 493 (S.D.N.Y. 2022) (quoting *Farella v. City of New York*, Nos. 05 Civ. 5711 & 05 Civ. 8264 (NRB), 2007 U.S. Dist. LEXIS 7420 at *2 (S.D.N.Y. Jan. 25, 2007)). And "speculative assertions as to the existence of [evidence] do[es]

9

not suffice to sustain a motion for spoilation of evidence." *Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F.Supp.2d 161, 177 (E.D.N.Y. 2007).

Proof of a negative isn't easy. As Magistrate Judge Paul Cleary noted, "it is difficult to prove [evidence] existed but has been destroyed; however, frequently a missing [piece of evidence] will be referred to in other surviving documents or will be recalled during deposition." *Pinstripe, Inc. v. Manpower, Inc.*, No. 07-CV-620-GKF-PJC, 2009 U.S. Dist. LEXIS 66422 at *11 (N.D. Okla. July 28, 2009). This threshold must be cleared however—as is the default in all civil litigation—by a preponderance of the evidence. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025).

**Discussion**

The preponderance standard isn't onerous, but it's also not toothless. *Jetel v. Jetel*, No. 25-cv-50329, 2025 U.S. Dist. LEXIS 215011 at *10 n.4 (N.D. Ill. Oct. 31, 2025); *United States v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999). In the instant case, a mountain of both physical evidence and direct testimony indicates without question that Powell's truck *should* have been equipped with a Lytx camera, which would have undoubtedly presented the best evidence available in this case as to whether Powell was negligent at the time of the collision. But just because ESI in the form of a video recording *should* have been collected doesn't mean it *was. See, e.g., United States v. King*, No. 20-CV-158, 2022 U.S. Dist. LEXIS 8024 at *64 (M.D. Pa. Jan. 14, 2022).

Despite that there *should* have been a camera, there is not a preponderance of evidence that there *was* a camera. There is simply no evidence—physical or

testimonial—that a camera was indeed installed on Powell's truck. Most pointedly, photographs from inside the cab of the truck are absent of any indication that a camera was ever present. What's more, persuasive deposition testimony indicates that *had* a camera been present, so too would evidence of that camera's presence: marks on the windshield, wiring, and/or a displaced dashboard. As anyone who has attempted to remove even a mere parking ticket sticker from their windshield can attest, this makes sense.

This Court often takes guidance from Occam's and Hanlon's razors. When confronted with different explanations for an occurrence, the simplest is the most likely explanation. *Jetel*, 2025 U.S. Dist. LEXIS 215011 at *3; *Madison St. Props., LLC v. Marcus Corp.*, No. 20-CV-50471, 2023 U.S. Dist. LEXIS 160196 at *7 (N.D. Ill. Sept. 11, 2023). And when faced with a situation whereby one could equally infer either malice or incompetence, generally err on the side of incompetence. *Hollis v. CEVA Logistics*, 603 F.Supp.3d 611, 624 (N.D. Ill. 2022); *DR Distribs.*, 513 F.Supp.3d at 951. This Court is not alone in using this type of analysis. *See, e.g., United States v. Withers*, 960 F.3d 922, 934 (7th Cir. 2020) (Easterbrook, J., concurring); *Raila v. Cook Cnty. Officers Electoral Bd.*, No. 19-CV-7580, 2021 U.S. Dist. LEXIS 215458 at *1 (N.D. Ill. Nov. 8, 2021) (Durkin, J.).

Here, notwithstanding the apparent lack of contractually obligated follow-through on the part of both T1 Transport and FedEx—not to mention false statements by both companies on various certifications—the version of events one would have to believe for it to follow that Powell's truck indeed had a dashcam at the

11

time of the collision is farfetched. The logical leaps required would include that in the early morning hours of a Northern Illinois winter, Powell—of his own accord—removed the dashcam and any of its accessories, concealing or destroying the dashcam and its accessories, and then rearranging or cleaning the interior of a totaled truck to obscure these actions from crash investigators, all within the minutes before Illinois State Police and Rockford Police arrived on scene, all without inadvertently sending the footage to Lytx and T1 Transport, and all without telling St. Ores, Schroeder, or Jenson.[11] Instead, the simpler inference and conclusion—that incompetence led to no dashcam being installed—is persuasive to the Court.

Because the Court can't find by a preponderance of the evidence that the allegedly destroyed ESI even existed, there is no need for the Court to continue in its analysis of Rule 37(e) curative measures or sanctions. Until the laws of physics change—perhaps with the assistance of a DeLorean equipped with a flux capacitor—it's impossible to destroy something that never existed. And it should go without saying—but apparently must be said—that, among other prerequisites of Rule 37(e), there's no duty to preserve ESI that doesn't exist.

**Conclusion**

The motion for relief under Rule 37(e) [265] is denied. In denying this motion, the Court leaves for another day the decision on whether the absence of a dashcam is relevant to the question of whether Powell was negligent in his operation of the

---

[11] Alternatively, such a theory would require a grand conspiracy amongst those employed at T1 Transport. Based upon the inconsistent deposition testimony present as it is, this is even more unlikely than Powell being a solo bad actor.

tractor trailer at the time of the collision. Fed. R. Evid. 401. In no way does this order bar White from seeking to introduce T1's concerning behavior identified in this order, nor does this order prejudge T1's potential objections to the introduction of this evidence. Today, the Court merely declines to issue curative measures or sanctions for the spoilation of evidence that has not been proven to exist by a preponderance of the evidence.

Date: April 22, 2026                    By:    _____

                                               Iain D. Johnston
                                               United States District Judge